IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| NORTHLAND CASUALTY COMPANY, a Connecticut Corporation,<br><br>Plaintiff and Counter-Defendant,<br><br>vs.<br><br>JOSEPH S. MULROY DBA YORLUM RANCH AND YORLUM RANCH LTD, NORTHWEST LOG HOMES LLC, and DUANE KEIM,<br><br>Defendants,<br><br>JOSEPH S. MULROY,<br><br>Counterclaimant and Third-Party Plaintiff,<br><br>vs.<br><br>GLACIER INSURANCE OF LIBBY, INC., a Montana Corporation,<br><br>Third-Party Defendant. | CV 13–232–M–DLC<br><br>ORDER |

Before the Court are the parties' cross motions for partial summary judgment on the issue of coverage, and Defendants' motion for partial summary

judgment on Plaintiff Northland Casualty Company's ("Northland") duty to defend. For the reasons explained below, Defendants' motions for partial summary judgment are denied and Northland's motion is granted.

## BACKGROUND

This case arises out of a construction defect claim involving a beetle-infested log home. In June 2006, Defendant Joseph Mulroy ("Mulroy") hired Defendant Duane Keim ("Keim") and Keim's company, Defendant Northwest Log Homes ("Northwest"), to construct a log home on Mulroy's property in Trego, Montana. Northwest was primarily responsible for construction of the "log shell" of the home, while subcontractors were to perform the remaining work to make the structure livable. Northwest purchased the logs to be used in the home from a log broker out of Striker, Montana, who in turn purchased the logs from one or more loggers in the northwest Montana region. The logs were standing dead timber. Northwest processed the logs by peeling, notching, pressure washing, and sorting them, but did not chemically treat the logs with insecticide. Northwest completed the project, which included a remodel of a guest house on the property, in 2008.

Through 2009 and 2010, Mulroy and his wife began noticing insect bore holes and track marks in the logs comprising the shell of the home. Mulroy attempted to treat the logs himself, but was unsuccessful. In 2011, Mulroy

brought the infestation issue to Northwest's attention and made a claim to Northwest's insurer, Northland. At the time Mulroy, Keim, and Northwest entered into their construction contract and through the time it took to build the home, Northland insured Northwest under an occurrence-based commercial general liability ("CGL") insurance policy with $1,000,000 per occurrence and $2,000,000 aggregate limits.

On July 5, 2011, Northland advised Keim and Northwest by letter that there was no coverage under the CGL policy for Mulroy's claims. In this initial letter, Northland indicated that there was no coverage because Mulroy's claims were for "breach of contract and faulty workmanship," and therefore did "not constitute claims for 'property damage' caused by an 'occurrence' as those terms [were] defined by the policy." (Doc. 39-3 at 2.) Northland further identified a number of exclusions contained in the policy which it contended would preclude coverage even if the claims did meet the "occurrence" definition. Northland advised Mulroy of its opinions and conclusions on July 18, 2011. Mulroy responded on October 19, 2011, urging Northland to accept Northwest's tender of a defense for his claims. Northland again declined a defense on November 16, 2011.

On December 16, 2011, Mulroy filed a complaint against Keim and Northwest in the Montana Nineteenth Judicial District Court of Lincoln County.

The complaint alleged negligence, negligent misrepresentation, and breach of warranty. Upon receipt of the complaint, Northland accepted defense of the claims under a reservation of rights in a letter dated March 1, 2012. Northland articulated the same coverage concerns in the reservation of rights letter as it had nearly a year before in its initial denial letter.

After nearly nineteen months of litigation in the underlying case, which included a $490,000 demand from Mulroy, Northland filed this declaratory judgment action on November 15, 2013. The parties then attended a settlement conference ten days later. The parties failed to resolve the case at the conference, and trial was set for January 28, 2014. The state court then granted Mulroy's motion to vacate the trial date, and on January 22, 2014 Northland sent a second reservation of rights letter to Keim and Northwest. The letter contained the same coverage analysis as Northland's previous two letters, and further reminded Northwest that it "may not voluntarily make a payment assume any obligation, or incur any expense . . . without [Northland's] consent." (Doc. 34-10 at 10.) At this point, Northland had been providing a defense to Northwest for just shy of two years.

On March 19, 2014, with this action pending and without notifying Northland, Mulroy, Keim, and Northwest entered into a "Settlement Agreement

and Assignment of Claims," providing for Northwest's "admission of liability and agreement to hold a hearing on damages in exchange for a covenant not to execute and assignment of all right relating to insurance." (Doc. 34-11 at 1.) Northwest was represented in this settlement and assignment by different counsel than had been provided by Northland since March 2012.

The hearing contemplated in the settlement agreement took place before the state court judge in Lincoln County on August 6, 2014, the same day the parties filed pretrial conference documents in this case. Northwest elected to be represented at this hearing by an attorney from the law firm which Northland had retained to represent the interests of its insured. The parties presented testimony from four witnesses: (1) William Finley, a log home restoration specialist, testified on Mulroy's behalf as to the available course of action for remedying the beetle infestation; (2) Terry Comstock, a real estate broker from Eureka, Montana, testified on Mulroy's behalf regarding the diminution in value of the log home even if remediation was successful in the future; (3) Mulroy himself testified; and (4) Dr. David Weaver, an entomologist from Montana State University, testified on Northwest's behalf as to the characteristics of the beetle species found in the logs. Notably, Dr. Weaver testified that the beetles "were in the timber when harvested, when it was delivered, and when construction occurred." (Doc. 34-1 at

2.) Keim did not attend the hearing.

This Court conducted a preliminary pretrial conference in this matter on August 13, 2014. The parties agreed that, due to the dispositive nature of the coverage question, it was appropriate to set discovery and motions deadlines as to that issue only. The Court therefore set a fully-briefed coverage motions deadline of April 10, 2015, but did not set this matter for trial.

Shortly after the pretrial conference, the state court judge issued findings of fact and conclusions of law on August 29, 2014. Ultimately, he concluded that Northwest and Keim were liable on all three counts in Mulroy's complaint, as stipulated, and awarded $208,824.58 in remediation damages and another $120,000 in damages related to diminution in the value of the home.

The parties filed the instant motions for partial summary judgment on March 20, 2015.

**LEGAL STANDARD**

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986). Only disputes over

facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248. In ruling on a motion for summary judgment, a court must view the evidence "in the light most favorable to the opposing part." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 1863 (quoting *Anderson*, 477 U.S. at 255).

"[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Co., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations omitted). "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Id*. (quoting Charles Alan Wright et al., *Federal Practice and Procedure* vol. 10A, § 2720 (3d ed. West 2014)). "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion." *Id*.

## ANALYSIS

A federal court sitting in diversity applies the substantive law of the forum

state to state law claims. *Mason & Dixon Intermodal, Inc. v. Lapmaster Intern. LLC*, 632 F.3d 1056, 1060 (9th Cir. 2011). Thus, the Court decides these motions for partial summary judgment pursuant to Montana insurance law.

"The interpretation of an insurance policy presents a question of law" to be decided by the Court. *Allstate Ins. Co. v. Wagner-Ellsworth*, 188 P.3d 1042, 1044 (Mont. 2008). The Court must "examine insurance contracts as a whole, with no special deference to specific clauses, . . . accord the usual meaning to the terms and the words in an insurance contract, and . . . construe them using common sense." *Modroo v. Nationwide Mut. Fire Ins. Co.*, 191 P.3d 389, 395 (Mont. 2008) (citations omitted). "[W]hen the language of a policy is clear and explicit, the policy should be enforced as written." *Steadele v. Colony Ins. Co.*, 260 P.3d 145, 149 (Mont. 2011) (citations omitted). "Courts should not . . . seize upon certain and definite covenants expressed in plain English with violent hands, and distort them so as to include a risk clearly excluded by the insurance contract." *Travelers Cas. & Sur. Co. v. Ribi Immunochem Research, Inc.*, 108 P.3d 469, 474 (Mont. 2005) (citations and internal quotation marks omitted).

**I.   Northland's duty to defend.**

Defendants contend that Northland breached its duty to defend Northwest and Keim not by actually denying a defense in the underlying action, but "by

failing to consider the interests of its insured and attempt settlement of the underlying action for an amount well within the policy limits, despite opportunities to do so." (Doc. 36 at 2.) Defendants further contend that, because Northland breached the duty to defend by breaching the purported duty to settle, Northland is liable for the amount of the consent judgment as determined by the state court judge. Defendants' argument is not supported by Montana law, and their motion is denied.

"Montana law is well-settled that an insurer's [contractual] duty to defend its insured arises when an insured sets forth facts which represent a risk covered by the terms of an insurance policy." *Farmers Union Mut. Ins. Co. v. Staples*, 90 P.3d 381, 385 (Mont. 2004) (citations omitted). "The duty to defend is independent from and broader than the duty to indemnify created by the same insurance contract." *Id*. The duty to defend specifically "arises when a complaint against an insured alleges facts, which if proven, would result in coverage" under the policy at issue. *State Farm Mut. Auto Ins. Co. v. Freyer*, 312 P.3d 403, 410 (Mont. 2013) (citations omitted). "If there is no coverage under the terms of the policy based on the facts contained in the complaint, there is no duty to defend." *Landa v. Assurance Co. of Am.*, 307 P.3d 284, 289 (Mont. 2013) (citations omitted). Insurers are not required to "seek out facts beyond the complaint" –

indeed, "insurers that look at facts beyond the allegations in the complaint do so at their own risk as they will be required to defend and/or indemnify based on the information discovered." *Id*. at 291 (citing *Revelation Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 206 P.3d 919, 926 (Mont. 2009)).

The duty to settle is a concept rooted in good faith. Montana statutory law prohibits insurers from "neglect[ing] to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear." Mont. Code Ann. § 33-18-201(6). Similarly, any contractual duty to settle on the part of an insurer flows not from an express provision, but from the covenant of good faith and fair dealing implied in an insurance contract. *Freyer*, 312 P.3d at 418 (citing *Jessen v. O'Daniel*, 210 F. Supp. 317, 325-326 (D. Mont. 1962)); *see also* 14 Steven Plitt et al., *Couch on Insurance* pt. VIII § 203:14 (3d ed., West 2014) [hereinafter *Couch*]. However, the Montana Supreme Court has "never held an insurer liable in bad faith for failing to settle within policy limits when it had a reasonable basis in law or fact for contesting coverage." *Freyer*, 312 P.3d at 418; *see Couch*, § 203:26 ("it is not bad faith for an insurer to refuse to settle an insured's claim within the policy limits when the question of policy coverage is fairly debatable and when the grounds for the refusal, if determined in the insurer's favor, would wholly defeat the indemnity responsibility of the insurer

to its insured"). "Without coverage, a duty to settle does not arise, even if the facts of the [underlying case] indicate that the insured's liability . . . is reasonably clear." *Freyer*, 312 P.3d at 422 (citations omitted).

Defendants' interpretation and application of the above is strained and, ultimately, fatal to their motion for partial summary judgment. Defendants recognize that the duty to settle derives from the implied covenant of good faith and fair dealing, and not from the express terms of the CGL policy. However, they urge the Court to evaluate whether the duty to settle was breached in this case through a binary lens – i.e. settlement equals compliance with the insurance contract, refusing to settle equates to a breach of the insurance contract – rather than through the "reasonableness" lens normally attending questions of good faith. Defendants cannot have it both ways, insofar as they cannot import the extra-contractual duty to settle into the CGL policy without also allowing Northland to justify why it refuses to settle. Defendants' citation to *Freyer* in this regard is misleading. Defendants quote the Montana Supreme Court's statement that "[a] breach of contract cannot be ameliorated by the reasonableness of the breaching party's actions." *Freyer*, 312 P.3d at 411. However, they do so out of context – the breach of contract at issue in that part of the court's opinion was State Farm's breach of the duty to indemnify, which was had been established by the court's

previous ruling on coverage. Defendants turn a blind eye to the part of the court's opinion *specifically stating* that whether the duty to settle has been breached is a question of reasonableness. *Freyer*, 312 P.3d at 418-419. Thus, whether Northland is liable for failing to settle within policy limits depends on whether it had a reasonable basis in law or fact for contesting coverage under the CGL policy.

Turning to Northland's conduct in this case, it is clear that it breached neither the duty to defend nor the duty to settle. Northland expressed its reservations concerning coverage in its July 2011 letter pre-dating Mulroy's suit. Nevertheless, Northland did accept a defense of the claims and informed Northwest of the acceptance under a reservation of rights within two and a half months of Mulroy filing his complaint. The reservation of rights letter was timely and consistent with industry practice in terms of its content. *See Couch*, § 202:46 (citing cases where courts found that reservation of rights letters sent five weeks, two months, and 120 days after the insurers' duty to defend was triggered were timely); *Id*. at § 202:47 ("[a]n insurer's notice of reservation of rights must fairly inform the insured of the insurer's position . . . [and] must provide sufficient factual information to alert the insured to the terms and conditions of the policy that the insurer relies upon, and how the insurer views their application to the facts

of the case"); *see also Portal Pipe Line Co. v. Stonewall Ins. Co.*, 845 P.2d 746, 749-750 (Mont. 1993) (indicating that reservation of rights letters, pursuant to § 33-18-201(14) of the UTPA, must "inform the insured of all policy defenses [the insurer] intends to rely upon"); Allan D. Windt, *Insurance Claims and Disputes* § 2:7 (6th ed., West 2014) ("[o]ut of an abundance of caution – in order to avoid a potential future estoppel – insurers sometimes issue reservation of rights letters when all of the coverage defenses reserved are without merit . . . [s]uch letters do not constitute a breach of contract"). The record does not indicate precisely what activity occurred in the underlying case between March 2012 and November 2013, but by that time the parties were prepared to participate in a settlement conference. The settlement master's report, dated November 25, 2013, shows that the parties negotiated for over five hours, but could not come to an agreement. The parties predictably dispute why they were unable to break the impasse, but the fact is Northland participated in the conference and made a tactical decision not to settle on that day. Whether Mulroy, Keim, and Northwest believe that Northland's participation was meaningful or not is irrelevant, given that any obligation to settle depended on the reasonableness of *Northland's* coverage evaluation. As the Court will explain below, Northland's basis for contesting coverage was more than reasonable – it was entirely correct. Consequently, Defendants' motion for partial

summary judgment as to the duty to defend is denied.

## II. Coverage for Mulroy's claims under the CGL policy.

The parties each move for partial summary judgment on the issue of coverage. Defendants contend that the CGL policy provides coverage for the damage to Mulroy's log home "because the re-infestation of bugs was clearly a fortuitous occurrence and none of the exclusions [in the policy] apply." (Doc. 38 at 6.) Northland contends that there is no coverage under the CGL policy "for the defective work of Northwest or the damages awarded in the underlying suit" because the damage did not arise from an "occurrence," as the term is defined in the policy and by Montana law. (Doc. 33 at 10.) Northland further contends that even if the damage was the result of an occurrence, a number of well-established exclusions in the CGL policy preclude coverage.[1] The Court agrees with Northland.

The Court begins with a review of two key terms of the CGL policy at issue. The policy provides coverage for "property damage" caused by an "occurrence." (Doc. 26-1 at 21.) "Property damage" refers to "physical injury to tangible

---

1. The Court need not reach the applicability of policy exclusions in this case, based on its analysis under the operative definition of "occurrence." However, similar considerations to those explained below apply to both the "your work" and "products-completed operations hazard" exclusions – namely, that CGL policies do not serve as warranties or guarantees of workmanship. *See Couch*, § 129:1.

property, including all resulting loss of use of that property." (*Id*. at 34.) An "occurrence" under the policy "means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id*. at 33.)

Whether coverage exists for a particular loss under an insurance policy is a narrower question than that of the duty to defend. "Unlike an insurer's duty to defend, which arises when a complaint against an insured alleges facts, which if proven, would result in coverage, an insurer's duty to indemnify arises only if coverage under the policy is actually established." *Freyer*, 312 P.3d at 410-411 (citations, quotations, and alterations omitted). "An insurer thus breaches the duty to indemnify by failing to provide coverage when (1) the established facts trigger coverage under the terms of the policy, and (2) the extent of the claimant's damages are undisputed or clearly exceed policy limits." *Id*. at 411. "'Established facts' in this context are facts that are either undisputed or are initially disputed but subsequently determined by the fact finder." *Id*.

When evaluating coverage pursuant to the above definition of "occurrence," "the proper focus is on whether [the insured's] deliberate operation . . . is covered – not whether [the insured] intended the resulting damages allegedly stemming from the operation." *Blair v. Mid-Continent Cas. Co.*, 339 Mont. 8, 12 (Mont.

2007); *see Landa v. Assurance Co. of Am.*, 307 P.3d 284, 289 (Mont. 2013) ("[W]e do not look to whether [the insured] intended the specific harm or damages that [the claimant] alleged. Instead, we must focus on the [insured's] acts . . . .").

An intentional business decision on the part of an insured generally does not constitute an "occurrence" within the scope of this definition. *King v. State Farm Fire & Cas. Co.*, 2010 WL 1994708, at *4 (D. Mont. May 18, 2010) (finding that the insured log home builder's decision to use logs which "were factory seconds and of lesser quality [than] those ordinarily provided in the industry" was not a covered "occurrence" under a CGL policy containing the above definition); *See also Couch*, § 129:4 ("[A] claim for faulty workmanship, in and of itself, is not an occurrence under a commercial general liability policy because a failure of workmanship does not involve the fortuity required to constitute an accident. Instead, what does constitute an occurrence is an accident caused by or resulting from faulty workmanship, including damage to any property other than the work product and damage to the work product other than the defective workmanship. In other words, although a commercial general liability policy does not provide coverage for faulty workmanship that damages only the resulting work product, the policy does provide coverage if the faulty workmanship causes bodily injury or property damage to something other than the insured's work product.")

In this case, the facts established in the underlying action do not trigger coverage under the CGL policy. Pursuant to the parties' settlement agreement, Keim and Northwest admitted liability to the counts in Mulroy's complaint, which included negligence, negligent misrepresentation, and breach of the implied warranty of habitability. The complaint provided that "[r]easonable and prudent standards in the construction of log homes include the chemical treatment of logs for beetle larvae and insects prior to installation." (Doc. 39-1 at 3.) At the damages hearing, Mulroy's expert witness, William Finley, testified that "had [Keim] treated the logs with pesticide prior to installation, a cost of twelve hundred dollars ($1,200), neither the home nor the guest home would have suffered from the current insect issues." (Doc. 34-1 at 2.) The decision not to treat the logs is the basis for the claims here, and cannot reasonably be characterized as an "occurrence" under the policy, as it was a volitional act and business choice on Keim's part. Dr. Weaver's testimony at the hearing does not change the calculus – whether the beetles were in the timber at the time of harvest does not transform Keim's decision against treating the logs into an accident. Instead, the notion that the beetles inhabiting the logs in the Mulroy home could go undetected from the time of harvest, through construction, and for several years thereafter, simply highlights the need to treat logs with insecticide, as a matter of

course in the industry, prior to their use in a finished home. Failure to do so is not a covered "occurrence" under the CGL policy at issue in this case.

## CONCLUSION

Based on the foregoing, the Court concludes that Northland did not breach the duty to defend its insured, Northwest, under the circumstances. Further, the facts established in the underlying case compel the conclusion that there is no coverage under the CGL policy for the damage to Mulroy's log home. Notwithstanding these conclusions, the Court views Mulroy's counterclaims related to Northland's representations regarding coverage, as well as Mulroy's third-party claims against Glacier Insurance of Libby, Inc., as pending. The Court's rulings on the instant motions for partial summary judgment does not appear to affect these claims.

Accordingly, IT IS ORDERED that:

(1) Defendants' motion for partial summary judgment regarding Northland's breach of the duty defend (Doc. 35) is DENIED.

(2) Defendants' motion for partial summary judgment regarding coverage (Doc. 37) is DENIED.

(3) Northland's motion for partial summary judgment (Doc. 32) is GRANTED.

(4) The Court will conduct a telephonic status conference in this matter on **July 29, 2015 at 3:00 p.m.** for the purpose of issuing a new scheduling order. The Court will contact the parties regarding call-in procedures prior to the conference. On or before July 28, 2015, the parties shall confer and jointly file proposed dates for completing discovery and filing additional motions. The Court will set a trial date accordingly.

DATED this 21st day of July, 2015.

Dana L. Christensen, Chief District Judge
United States District Court